Amy BRENNAN, Plaintiff,

v.

**NATIONAL TELEPHONE DIRECTORY CORPORATION, Penn–Del Directory Corporation, and Bell Atlantic Enterprises International, Inc., Defendants.**

No. 93–CV–5899.

United States District Court, E.D. Pennsylvania.

April 7, 1995.

---

David P. Bateman, Delany & O'Brien, Philadelphia, PA, for plaintiff.

Jeffrey E. Fleming, Morgan, Lewis & Bockius, Philadelphia, PA, for defendants.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

This discrimination case is before the Court today on motion of the defendants,

which seek an order granting them summary judgment as to all ten counts of Plaintiff's amended complaint. Plaintiff alleges that she was terminated from her employment on account of her gender and pregnancy in violation of state and federal law. For the reasons that follow, the defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Facts

The defendants in this case are National Telephone Directory Corporation ("NTD"), a New Jersey corporation with its principal offices in Somerset, New Jersey; Penn–Del Directory Corporation ("Penn–Del"), a related corporation with offices in Bensalem and Harrisburg, Pennsylvania; and Bell Atlantic Enterprises International, Inc. ("Bell Atlantic"), which became a general partner in both NTD and Penn–Del after purchasing the two companies from Bell of Canada Enterprises ("BCE") in January of 1993. The plaintiff, Amy Brennan, is a New Jersey resident who was hired on April 7, 1986, and began working as a sales training coach in Penn–Del's office in Bensalem, a Philadelphia suburb.

By January 1, 1987, Ms. Brennan had been promoted to the position of district sales manager and transferred to Penn–Del's office in Harrisburg. In November of 1988, Ms. Brennan returned to Bensalem and assumed the position of account executive. As an account executive, Ms. Brennan was responsible for the selling and servicing of advertising in the Yellow Pages of the telephone directory. One of the more important aspects of her position was to ensure the accuracy of the paperwork for a given account. A minor lapse in the accuracy of the paperwork could result in a crucial error, such as an incorrect address or phone number, appearing in an advertisement.

To combat sales errors, the defendants employed a written policy regarding "chargeable errors." Pursuant to that policy, the division manager and customer service manager would, once an error was discovered, investigate the circumstances and make a determination as to whether to charge the error to the sales representative. After the investigation, the account executive was given the opportunity to discuss the matter and offer his or her version of the events. The division manager and customer service manager would then decide whether to charge the account executive with the sales error. A sales representative would be assessed a chargeable error if he or she was either fully or partially responsible for the error. The account executive would then sign an acknowledgement form, which alerted the account executive as to the following company policy: (1) an account executive was to be counseled after each chargeable error; (2) the account executive would be given an in depth interview with the vice president of sales after four chargeable errors; and (3) the company could take "drastic measures," including termination, if the account executive were assessed with four chargeable errors in a given calendar year.

The record reflects that Ms. Brennan was one of the defendants' more valuable employees. Indeed, she was twice recognized as sales representative of the month and also won trips to Cancun, Mexico and Aruba as rewards for her performance. The record also reflects, however, that Ms. Brennan had some difficulty with the paperwork involved in processing the accounts, and that she was criticized, on more than one occasion, for a lack of attention to detail. During 1990 and 1991, Ms. Brennan was assessed five chargeable errors, but she was not terminated because she collected less than four errors in each year.

In January of 1992, Ms. Brennan went on disability leave due to the complicated nature of her pregnancy. She was scheduled to return to work in July of 1992. In the spring of 1992, however, six sales errors surfaced involving accounts assigned to Ms. Brennan. Ms. Brennan's division manager, James Schmitt, contacted her in June of 1992 and informed her of the six potential chargeable errors that were pending against her. The evidence presented suggests that Mr. Schmitt had already decided to charge her with three of the errors at the time they informed her of the pending charges. Documentation regarding the errors was forward-

ed to Ms. Brennan on June 18, 1992.[1] On June 28, 1992, Ms. Brennan was again contacted by Mr. Schmitt to discuss the errors. Ms. Brennan admitted that she was at fault with respect to one account, but denied making any mistakes regarding the remaining five chargeable errors. Nonetheless, Mr. Schmitt decided to terminate Ms. Brennan. After consulting with the vice president of sales, who concurred with the decision to terminate, Mr. Schmitt informed Ms. Brennan that she would be fired effective July 9, 1992. Ms. Brennan never received counseling after each chargeable error, never signed an acknowledgement form regarding the errors, and was never interviewed by the vice president of sales.

### B. *Procedural Summary*

Ms. Brennan filed a charge with the Equal Opportunity Employment Commission ("EEOC") on October 6, 1992, alleging that Penn–Del and NTD had discriminated against her on the basis of gender and pregnancy. On January 7, 1993, she filed a similar action with the Pennsylvania Human Relations Commission ("PHRC"). The EEOC issued a "no cause" determination on August 6, 1993, in which it concluded that four errors per year is sufficient cause for discharge, and that both men and women had been terminated for violating the chargeable errors policy.

On November 8, 1993, Ms. Brennan commenced the instant action by filing a complaint in this Court. Ms. Brennan's amended complaint, filed on May 31, 1994 pursuant to this Court's Memorandum and Order of April 28, 1994,[2] contains ten counts, four of which arise under federal law. Count I of the amended complaint contains an allegation that the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, by terminating her employment on account of her gender and pregnancy. In Count II, Ms. Brennan claims that the defendants violated Title VII by discriminating against her in the terms and conditions of

her employment on account of her pregnancy. Ms. Brennan further alleges, in Count III, that the defendants undertook a determined effort to rid working mothers from their work force. In Count IV, Ms. Brennan sets forth a claim for punitive damages under Title VII.

Ms. Brennan has also brought six claims under state law. Count V contains the allegation that the defendants violated both the Pennsylvania Human Relations Act ("PHRA"), 43 Pa.Stat.Ann. § 951 *et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 *et seq.*, by discriminating against Ms. Brennan on account of her gender and pregnancy. In Count VI, Ms. Brennan alleges that the defendants discriminated against her in the terms and conditions of employment based upon her pregnancy disability in violation of the NJLAD. Count VII sets forth a claim for punitive damages under the PHRA and NJLAD. In Count VIII, Ms. Brennan alleges that the defendants breached an implied covenant to discharge only for just cause in violation of Pennsylvania and New Jersey law. Count IX has been deleted. In Count X, Ms. Brennan alleges that the defendants breached an implied covenant of good faith and fair dealing under Pennsylvania and New Jersey law. Finally, in Count XI, Ms. Brennan asserts that she was discharged in violation of the public policy of New Jersey. On November 23, 1994, the defendants filed the instant motion, in which they seek an award of summary judgment as to the entire amended complaint.

## II. *DISCUSSION*

### A. *The Summary Judgment Standard*

This Court is authorized to award summary judgment "if the pleadings, depositions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court's responsibility is not to resolve disputed issues

---

**1.** According to the defendants, the materials were sent to the plaintiff because she declined to return to the office, while the plaintiff contends that her superiors did not permit her to return.

**2.** *See Brennan v. National Tel. Directory Corp.,* 850 F.Supp. 331 (E.D.Pa.1994).

of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). Boiled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

## B. *Whether NTD and Bell Atlantic are Proper Defendants*

At the outset, we address the defendants' argument that summary judgment should be awarded to NTD and Bell Atlantic on the grounds that they are not proper defendants in the instant case. The defendants assert that Penn–Del, and not NTD or Bell Atlantic, was Ms. Brennan's employer. They further note that Bell Atlantic did not become a general partner of the NTD and Penn–Del until six months after Ms. Brennan had been discharged. For her part, Ms. Brennan asserts that Penn–Del and NTD are interrelated and indistinguishable, and that she considered herself to be an employee of both companies. Further, she argues that Bell Atlantic is liable as either a successor in interest or a general partner of Penn–Del and NTD.

### 1. *NTD*

■ We addressed these issues in our Memorandum and Order disposing of the defendants' motion to dismiss. At that time, we declined to dismiss the claims as to NTD because there had not yet been any discovery taken on the issue of whether NTD was Ms. Brennan's employer. We noted, however, that if "defendants want wish to raise this issue after a proper factual determination,

they are free to do so." *Brennan v. National Tel. Directory Corp.*, 850 F.Supp. 331, 339 (E.D.Pa.1994) ("*Brennan I*"). Since that time, Ms. Brennan has offered evidence to suggest that NTD and Penn–Del are interrelated companies. For instance, the record reveals that one man is the president and chief executive officer of both companies. In addition, Ms. Brennan offers Mr. Schmitt's business card, which features the corporate logo of both companies, as further evidence to support her general conclusion.

But while Ms. Brennan has produced ample evidence to suggest that the two companies are related, she has failed to create a disputed issue of fact regarding whether she was employed by NTD. Indeed, the evidence presented shows that she signed an employment agreement in which she expressly acknowledged that she was employed by Penn–Del. Moreover, the evidence reveals that NTD has offices only in New Jersey, and that Ms. Brennan was never employed in New Jersey. The evidence offered by Ms. Brennan might suggest that NTD and Penn–Del are related companies, but it does not create an issue of fact regarding whether NTD was her employer. Since Ms. Brennan has failed to raise a shred of evidence to suggest that she was employed by NTD, we must grant the defendants' summary judgment motion with respect to NTD on all of the claims in the amended complaint.

### 2. *Bell Atlantic*

The defendants offer two arguments in support of their request for summary judgment with respect to the claims against Bell Atlantic. First, they contend that since Bell Atlantic was not a named defendant in the EEOC action, they are not a proper defendant in the instant case. Second, they assert that Bell Atlantic had no relationship to any of the other parties in this lawsuit until six months after Ms. Brennan was discharged. Both of these arguments were made by the defendants in their motion to dismiss. In our Memorandum and Order, we rejected the former argument, and noted that the latter argument was premature in that discovery had not yet been taken concerning whether Bell Atlantic could be held liable as a successor corporation. *Brennan I*, 850 F.Supp. at

339–40. Thus, now that the discovery phase has concluded, we address the issue of successor liability.

█ Generally, the successor doctrine arises in the context of discrimination cases in situations where the assets of a defendant employer are transferred to another entity. Thus, the purpose of the doctrine is to ensure that an employee's statutory rights are not "vitiated by the mere fact of a sudden change in the employer's business." *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985). The doctrine allows the aggrieved employee to enforce against the successor a claim he could have secured against the predecessor. *Id.; see Kolosky v. Anchor Hocking Corp.*, 585 F.Supp. 746, 749 (W.D.Pa. 1983) (Title VII plaintiff may properly join successor corporation under circumstances where there is a continuity of identity between successor corporation and its predecessor).

█ Thus, applicability of the doctrine hinges on the need to protect a plaintiff where the offending entity is substituted by another company. Upon review of the evidence submitted, we conclude that the doctrine is inapplicable in the instant case. First, Bell Atlantic was never Ms. Brennan's employer. The evidence reveals that Bell Atlantic purchased Penn–Del from BCE six months after Ms. Brennan's termination. Penn–Del was not replaced by another company; instead, it continues to function as an independent entity capable of satisfying any judgment rendered against it. Thus, it seems that the label "successor corporation" better describes Bell Atlantic's position vis a vis BCE than it does to Penn–Del. Because Penn–Del continues to exist as an operating entity from which Ms. Brennan may obtain relief, and because Bell Atlantic is not a successor corporation as to Penn–Del, we decline to invoke the doctrine of successor liability in this case. Accordingly, the defendants' summary judgment motion as to Bell Atlantic will be granted as to all claims brought against it.[3]

## C. *Title VII Claims*

As noted above, Ms. Brennan has set forth four claims under Title VII. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Thus, the Court's ultimate task in this case is to determine whether the plaintiff has carried her burden of showing, by a preponderance of the evidence, that the employer intentionally discriminated against her. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993); *see Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 (3d Cir.1985) ("[A] plaintiff must show that his status as a minority class was the but for reason for the treatment accorded."), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986).

In evaluating claims brought under Title VII, we follow the procedure allocating burdens of proof as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Accordingly, the plaintiff bears the initial burden of presenting a prima facie case by demonstrating that (1) she is a member of a protected class; (2) she was qualified for the job from which she was terminated; (3) she was terminated; and (4) others not in the protected class were treated more favorably. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824); *Blanding v. Pennsylvania State Police*, 811 F.Supp. 1084, 1093 (E.D.Pa. 1992), *aff'd,* 12 F.3d 1303 (3d Cir.1993); *Butler v. Elwyn Inst.*, 765 F.Supp. 243, 246 (E.D.Pa.1991). Should the plaintiff clear this hurdle, a presumption of discrimination is created and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for discharging the plaintiff. *Fuentes,* 32 F.3d at 763; *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990).

---

**3.** In her opposition to the defendants' summary judgment motion, Ms. Brennan makes no attempt to support her contention that Bell Atlantic can be held liable as a general partner of Penn–

Del, apparently conceding the issue. Accordingly, we will not deny the motion as to Bell Atlantic on that basis.

The employer need only produce sufficient evidence to enable a factfinder to conclude that the action taken was motivated by a nondiscriminatory purpose. *Fuentes,* 32 F.3d at 763. If the defendant is able to offer evidence sufficiently probative of a legitimate employment action, the presumption evaporates and the onus is again on the plaintiff, who bears the ultimate burden of showing that a discriminatory purpose was a determinative factor in the decision to discharge the plaintiff. *Id.* at 764; *Bellissimo,* 764 F.2d at 179–80. The plaintiff can either prove this directly, by showing that discriminatory considerations motivated the defendant's actions, or indirectly, by showing that the rationale provided by the defendant is unworthy of credence. *Josey,* 996 F.2d at 638; *Weldon,* 896 F.2d at 797.

### 1. *Timeliness of the Title VII Claims*

■ Before we consider the merits of the defendants' arguments in favor of summary judgment, we address their contention that Count II should be dismissed because Ms. Brennan failed to file her charge of discrimination in a timely fashion. The evidence shows that Ms. Brennan allegedly suffered the discrimination in December of 1991,[4] that she filed her claim with the EEOC on October 6, 1992, and she filed with the PHRC on January 7, 1993. Under Title VII, a federal court has no jurisdiction over a discrimination case unless a claim has been previously filed with the EEOC. 42 U.S.C. § 2000e–5(e)(1); *Trevino–Barton v. Pittsburgh Nat'l Bank,* 919 F.2d 874, 878 (3d Cir.1990). Further, if the matter arises in a "deferral state;" that is, a state like Pennsylvania that has its own agency in place to adjudicate discrimination cases, the charge must be filed with the EEOC within 300 days of the alleged unfair employment practice, § 2000e–5(e); *Shaffer,* 565 F.Supp. at 910–11, but cannot be filed with the EEOC unless it is first filed with the state agency and either (1) 60 days elapse, or (2) the state agency terminates its proceedings. § 2000e–5(e); *Shaffer v. National Can Corp.,* 565 F.Supp. 909, 910 (E.D.Pa.1983).

■ Like many states, however, Pennsylvania has entered into a workshare agreement with the PHRC, pursuant to which it has waived its right to exclusive jurisdiction over Title VII discrimination cases during the 60 day deferral period. These waivers have been construed as self-executing, and allow a case which might otherwise have been brought first to the PHRC to be processed immediately by the EEOC if it was first filed there. . *Trevino,* 919 F.2d at 879. Provided there is a workshare agreement, therefore, the aggrieved employee meets the statutory. filing requirement as long as the claim is filed with the EEOC within 300 days of the allegedly discriminatory conduct. 42 U.S.C. § 2000e–5(e)(1). Thus, since the claim was filed on October 6, 1992, the claim was timely filed as long as the discriminatory conduct occurred after December 11, 1991. Ms. Brennan's deposition testimony indicates that the conduct occurred after December 20, 1991. Thus, we cannot say that the facts concerning our jurisdiction over this matter are undisputed. Accordingly, we must reject the defendants' argument.

### 2. *Prima Facie Case*

Turning now to the merits, we first consider the defendants' first argument: that the defendants must be awarded summary judgment on the Title VII claims because Ms. Brennan cannot establish a prima facie case of discrimination. Thus, to prevail at the summary judgment stage, the defendants must show that there is no genuine issue as to a material fact regarding one of the four factual prongs of the prima facie stage of the *McDonnell Douglas* analysis. Defendants zero in on the fourth prong, and argue that the only other Penn–Del employee in the Bensalem office who collected four chargeable errors, Edward Stromberg, was also discharged. Thus, the defendants argue that Ms. Brennan has failed to raise any evidence suggesting that similarly situated males were treated more favorably.

We must reject this argument, in the first instance, because it misapprehends the extent of a plaintiff's burden at the initial stage of the *McDonnell Douglas* analysis. Our

---

4. The exact date is not included in the amended complaint.

Court of Appeals has noted that a plaintiff's burden at this stage "is not onerous," *Weldon*, 896 F.2d at 797, and that "[p]roof of discharge will establish a prima facie showing in a Title VII suit." *Bellissimo*, 764 F.2d at 180. Thus, to satisfy the fourth prong of the test, it is enough if Ms. Brennan shows that men who worked with her were not discharged. *Id.* Further, upon review of the evidence submitted, we note that the circumstances preceding Mr. Stromberg's discharge differed significantly from those regarding Ms. Brennan. While Mr. Stromberg was counseled and warned after each of his chargeable errors, Ms. Brennan was informed of her six errors at once while on maternity leave, and was never counseled, in violation of the established policy. Thus, we are unconvinced that no genuine issue of fact exists regarding whether Ms. Brennan and Mr. Stromberg were similarly treated, and we therefore cannot award summary judgment to the defendants on the grounds that Ms. Brennan has failed to make out a prima facie case.

### 3. *Whether Reason for Discharge is Pretextual*

■ The defendants further contend that even if Ms. Brennan could establish a prima facie case, there is no genuine issue of fact that she was terminated for a legitimate, non-discriminatory reason.[5] As we noted above, a Title VII plaintiff must prove at trial that both that the employer's reason was false and that discrimination was the real reason for the discharge. *Fuentes*, 32 F.3d at 763. But as our Court of Appeals has recently held, the plaintiff's burden is not as onerous when attempting to survive a summary judgment motion. In such situations, the plaintiff need only demonstrate that there are disputed factual issues concerning either (1) whether the proffered reason for discharge is false, or (2) whether an invidious discriminatory reason was more likely than not a motivating or determinative cause for the discharge. *Id.* at 764; *see Torre v. Ca-*

*sio, Inc.*, 42 F.3d 825, 830 (3d Cir.1994) (applying the same analysis in the age discrimination context).

■ The issue for the Court is therefore whether Ms. Brennan has adduced evidence sufficient to create a disputed issue of fact as to one of the two tests set forth above. The crux of Ms. Brennan's case is that management's bias manifested itself in the investigation and the assignment of culpability as to the six chargeable errors that led to her discharge. She claims that an effort to rid the Penn–Del workforce of working mothers motivated management to affix the blame for the errors to Ms. Brennan, even though the fault for the errors more appropriately belonged elsewhere. For their part, the defendants argue that Ms. Brennan has not offered any evidence to support her claim. Upon careful review of the evidence submitted, however, we conclude the Ms. Brennan has raised an issue of fact as to whether the stated reasons for her discharge were worthy of credence. Accordingly, we cannot grant the defendants' summary judgment motion as to the Title VII claims on the grounds that Ms. Brennan has failed to raise a disputed issue of fact.

We first note that Ms. Brennan has put forth sufficient evidence to create an issue of fact as to whether Penn–Del management harbored a hostile attitude toward working mothers. Indeed, Ms. Brennan has offered the depositions of three female former account executives who have testified as to specific instances of discrimination and corporate disfavor of working mothers in the workforce. There is evidence of management's inconsistent responses to requests for accommodations submitted by men and women, the assignment of choice accounts to men over women, and Ms. Brennan's own testimony regarding the disparate manner in which her discharge was achieved, vis a vis the discharge of Mr. Stromberg. Moreover, Ms. Brennan has raised disputed issues of material fact concerning the circumstances sur-

---

**5.** The defendants also request judgment on the PHRA and NJLAD claims for the same reasons. A gender discrimination claim under the PHRA and NJLAD is governed by the same burden of proof structure as claims brought under Title VII. *Waldron v. SL Indus., Inc.*, 849 F.Supp.

996, 1000 (D.N.J.1994); *Fairfield Township Volunteer Fire Co. v. Pennsylvania Human Relations Comm'n*, 530 Pa. 441, 609 A.2d 804, 805 (1992). Thus, for purposes of this argument, we will treat the PHRA and NJLAD claims together with the Title VII claims.

rounding the assignment of chargeable errors to her with respect to five of the six accounts. The evidence submitted raises questions concerning whether the errors were properly charged to Ms. Brennan.

### a. *The Humphrey's Pest Control Account*

This error involved an advertisement that did not get into the Yellow Pages. There is evidence to suggest that Ms. Brennan and her supervisor visited the customer, who related his wishes as to how his advertisement should appear. Ms. Brennan turned the assignment over to the art department, which returned an unsatisfactory product two and a half weeks later. Ms. Brennan sent the product back to the art department. As the deadline approached, Ms. Brennan asked her supervisor, Mr. Zickler, to intervene. Mr. Zickler gave Ms. Brennan permission to speak with people in the art department. Art department personnel assured her the advertisement would be prepared in time to meet the deadline, but then failed to do so. The evidence further suggests that Mr. Zickler offered to take responsibility for the error, and that Mr. Zickler was asked to fill out a report concerning the incident in June of 1992, six months after the incident occurred and while Ms. Brennan was on maternity leave. Additionally, in his deposition testimony, Mr. Solano, the customer service manager, admitted that the art department's turnaround was too slow. Thus, there is evidence from which a jury could conclude that Ms. Brennan was charged with an error for which she was not responsible.

### b. *The Republic Packing Account*

This incident involves an advertisement appearing with an address that did not conform to the advertiser's wishes. The policy mandated by Bell of Pennsylvania ("Bell") was that the address appearing in the advertisement must match the address on file with the business office. There is evidence to suggest that Ms. Brennan notified the customer's agent as to Bell's policy, and that the address would be changed accordingly. Thus, when the advertisement appeared, the customer objected that the address was not published in the manner he requested. Initially, in the summer of 1991 when the error arose, management sided with Ms. Brennan. A year later, however, while Ms. Brennan was on maternity leave, the company elected to charge Ms. Brennan with the error. Thus, the assignment of culpability to Ms. Brennan well after the incident took place, and while she was on maternity leave, raises the inference that discrimination played some role in management's decision.

### c. *The David Wedell Account*

This error concerns a dentist who requested that all of his advertising except a bold listing be canceled. The record reveals sufficient evidence to prove that the customer approved of the change by signing the appropriate paperwork. Some time later, the customer called to request the cancellation of the bold listing advertisement. Ms. Brennan then informed the customer of company policy to the effect that changes could not be made within 45 days of a directory's closing. The customer then contacted customer service. Customer service issued a "sales story" to Ms. Brennan, asking her to relate her version of the events. Ms. Brennan responded by stating that she canceled the advertisement as the customer requested. Mr. Solano took this to mean that she canceled all of the customer's advertising. Thus, since the bold listing still appeared, Ms. Brennan was charged with the error. There is sufficient evidence to suggest, however, that Ms. Brennan did nothing wrong with respect to this account, and that the error was caused by a failure of communication between her and Mr. Solano. Thus, the evidence presented by Ms. Brennan regarding the David Wedell account raises the inference that she was assigned an error arbitrarily.

### d. *The Little Friends Day Care Account*

This account involved a customer that canceled its advertising, but its advertisement continued to run in the Yellow Pages. There is evidence to suggest the pertinent contracts indicated that the account had been closed. Ms. Brennan contacted the customer, and was informed that it remained uninterested. She then submitted the appropriate paperwork. All of the indications at Ms. Brennan's disposal indicated that the account was not assigned to her. Despite this, the advertisement continued to run, and Ms. Brennan

was charged with the error. Thus, there is sufficient evidence from which a jury could conclude that the account was not assigned to Ms. Brennan, and that she was charged with the error wrongly.

### e. *The Best Plumbing Account*

The timing of this chargeable error raises a question as to whether the Penn–Del used the incident as a pretext for discharging Ms. Brennan. The evidence shows that the error occurred in 1989, and that a sales story was sent to Mr. Zickler in January of 1991. While Ms. Brennan concedes that she made an error with respect to the account, the fact that she was charged in 1992 for an incident that occurred in 1989 is at least some evidence that a jury could use to conclude that Penn–Del's reasons for terminating Ms. Brennan were untrue.

Thus, upon review of the evidence submitted, it is clear that Ms. Brennan has raised sufficient evidence to create a material issues of fact regarding: (1) whether the reasons supporting the decision to discharge were worthy of credence and (2) whether she was discriminated against in the terms and conditions of employment and eventually terminated on account of her gender and pregnancy. In some instances, the defendants have offered explanations for their behavior. For example, the defendants argue that Mr. Stromberg's treatment differed from Ms. Brennan's because Ms. Brennan was on maternity leave and unavailable for counseling. Such explanations do not render the issue undisputed, however. A jury will be given the opportunity to consider the explanations and evaluate their validity. Since disputed issues of fact material to the outcome of the case remain, the defendants' summary judgment motion must be denied as to the Title VII claims contained in the first two counts of the amended complaint.

### 4. The "Sex Plus/Pregnancy Discrimination" Claim

In Count III of her complaint, Ms. Brennan has set forth a claim for sex plus pregnancy discrimination, in which she alleges that the defendants engaged in an effort to rid working mothers from its workforce. The defendants argue that they are entitled to summary judgment on that claim because it is duplicative of the claims for relief set forth in Counts I and II. This issue was addressed in *Brennan I,* where we held that Ms. Brennan had failed to set forth a separate claim. We noted that Count III was merely a recitation of the evidence she planned to present in support the claims set forth in the first two counts. Thus, we dismissed Count III and allowed Ms. Brennan the opportunity to replead "should she have additional facts that pertain to her and which purport to state a separate Title VII violation other than those asserted in counts one and two." *Brennan I,* 850 F.Supp. at 339.

The defendants make the same objection here with respect to the amended complaint, arguing that Count III fails to set forth a separate claim. We agree with the defendants. The only new claim pertaining to Ms. Brennan is her allegation that "the defendants utilized ambiguous working rules and specifically selectively utilized its 'errors policy' to directly discriminate against the plaintiff, Amy Brennan and/or other working mothers." Amended Complaint, para. 65. This allegation, however, is a mere reprise of the contention presented in the first count, in which Ms. Brennan alleged that the errors policy "served as ruse to terminate the Plaintiff's employment while she was on maternity leave." *Id.* at para. 32. Accordingly, Ms. Brennan has failed to state a separate Title VII claim in Count III, and as a result, we are compelled to award summary judgment to the defendants as to that count.

### 5. *Pregnancy Disability Discrimination Claim*

■ The defendants argue that they are entitled to summary judgment to the extent that Count II of the amended complaint requests relief under the theory that the defendants discriminated against Ms. Brennan on the basis of her "pregnancy disability." The defendants correctly note that while Title VII prohibits discrimination based upon a person's "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2, it does not prohibit disability discrimination. Thus, such claims are not cognizable under Title VII. *See Schrader v. Gulf Oil,* No. 93–6794, 1994 WL 672640, at *5, 1994 U.S.Dist. LEXIS

17129, at * 13 (E.D.Pa. Nov. 28, 1994) ("The language of Title VII does not prohibit discrimination on the basis of handicap or disability."). Accordingly, we must grant summary judgment to the defendants to the extent that Count II states a claim based on pregnancy disability discrimination under Title VII.

### 6. *Punitive Damages*

The defendants also seek summary judgment with respect to the separate claims set forth for punitive damages under Title VII, the PHRA, and the NJLAD. The defendants contend, as they did in their motion to dismiss, that the requests for punitive damages are incidental to the substantive claims and therefore should not be set forth in separate claims. In *Brennan I*, we noted that the "defendants have not provided the Court with any reason why a separate claim for punitive damages cannot be pled under PHRA and NJLAD, or Title VII." *Brennan*, 850 F.Supp. at 347. Thus, we allowed the claims to stand as pleaded. The defendants now argue that such an arrangement will prejudice the defendants in that it suggests to a jury that Ms. Brennan has some sort of entitlement to punitive damages. It seems, however, that a simple jury instruction can address the defendants' concerns. Accordingly, we reject the defendants' contention.

The defendants also argue that we should grant them summary judgment with respect to the punitive damages claims because Ms. Brennan has failed to adduce sufficient evidence on which a jury could base such an award. Punitive damages are available under the PHRA, the NJLAD and Title VII "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *Weiss v. Parker Hannifan Corp.*, 747 F.Supp. 1118, 1135 (D.N.J.1990); *SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 587 A.2d 702, 704 (1991). As we noted above, there is sufficient evidence on the record from which a

jury could infer that the defendants discharged Ms. Brennan while she was on maternity leave in an unlawful attempt to purge its workforce of working mothers. This evidence provides a basis for the conclusion that the defendants acted with the requisite mental state. Accordingly, Ms. Brennan's claim for punitive damages will survive this motion.

### D. *Pendent Claims*

#### 1. *Choice of Law Concerns*

The Court now turns to the choice of law issues presented by the case in an effort to define the scope of law under which Penn–Del may be liable. As we noted above, Ms. Brennan, in Counts V through XI of her amended complaint, has set forth a variety of claims under the contract, tort, and statutory discrimination law of both Pennsylvania and New Jersey. The evidence relevant to this issue suggests that while Ms. Brennan resided in New Jersey, she was employed in Pennsylvania and worked there almost exclusively. The evidence further reveals that Ms. Brennan signed an employment contract which provided that the agreement was to be governed by the law of New Jersey. In light of this evidence, Ms. Brennan concedes that her statutory discrimination claims and her claims arising in tort should be governed by Pennsylvania law, and that New Jersey law should govern her claims sounding in contract. As a result, we will award summary judgment to the defendants as to Counts V and VII to the extent that those counts contain claims set forth under the New Jersey law; and we will grant summary judgment to the defendants to the extent that Counts VIII and X are set forth under Pennsylvania law. Further, summary judgment is awarded to the defendants as to Counts VI and XI.

#### 2. *Timeliness of the PHRA Claims*

We now consider the defendants' argument, which we addressed in *Brennan I*, that Ms. Brennan's PHRA claims must be dismissed because they were not filed with the PHRC within 180 days of the acts of alleged discrimination, as required by § 959(h) of the PHRA.[6] The record indi-

---

**6.** Section 959(h) provides that "[a]ny complaint

filed pursuant to this section must be so filed

cates that the claims were filed on January 7, 1992, 182 days after Ms. Brennan's termination. In *Brennan I,* we noted that the PHRA provided for equitable tolling, and that tolling is appropriate in cases where the plaintiff has timely asserted her rights in the wrong forum. *Brennan I,* 850 F.Supp. at 340; *see Kocian v. Getty Refining & Marketing Co.,* 707 F.2d 748, 753 (3d Cir.) (equitable tolling appropriate if (1) the defendant has actively mislead the plaintiff, (2) the plaintiff has been prevented from asserting his rights, or (3) if plaintiff has timely asserted his rights in the wrong forum), *cert. denied,* 464 U.S. 852, 104 S.Ct. 164, 78 L.Ed.2d 150 (1983).

The record here reflects that Ms. Brennan filed her claim with the EEOC on October 6, 1992. Ms. Brennan indicated that the matter was to be filed with the PHRC. Pursuant to the workshare agreement, Ms. Brennan reasonably expected that the claim would be cross-filed with the PHRC, and was so assured by EEOC personnel. For reasons beyond Ms. Brennan's control, however, the cross-filing did not occur; and Ms. Brennan personally filed the claim with the PHRC on January 7, 1993, two days after the expiration of the 180 day period. Under these circumstances, we decline to dismiss the PHRA claims on these technical grounds. Accordingly, Ms. Brennan's PHRA claims will survive this argument in favor of summary judgment.

### 3. *Breach of Covenant Claims*

■ The defendants next argue that they are entitled to summary judgment as to Counts VIII and X of the amended complaint, in which Ms. Brennan states claims for breach of an implied covenant to discharge for cause and breach of covenant of good faith and fair dealing, respectively. The defendants contend that such claims are preempted by the PHRA or the NJLAD, and in the alternative, they assert that neither claim is cognizable since Ms. Brennan was indisputably an employee at will. We addressed both arguments in *Brennan I.*

First, with respect to Count VIII, we noted that Ms. Brennan' claim was based not on discrimination, but on the defendants' violation of their own policy regarding discharge. Thus, we held that the claim was not barred by the PHRA. *Brennan I,* 850 F.Supp. at 345. Similarly, we held that Count X was not barred by the PHRA in that the claim was not predicated on discrimination. *Id.* For similar reasons, because the claims are based not on discrimination but instead arise under contract theory, we now conclude that neither claim is preempted by the NJLAD. On the other hand, we noted that neither claim could be brought in the context of the at-will employment relationship. *Id.* at 346. Thus, we concluded that Ms. Brennan could maintain these claims only if she could set forth sufficient evidence to prove that the parties intended to overcome the presumption that Ms. Brennan was an at-will employee. *Id.*

■ Under New Jersey law, the traditional rule is that an at-will employee may be discharged at any time, for any reason or for no reason at all. *Velantzas v. Colgate–Palmolive Co.,* 109 N.J. 189, 536 A.2d 237, 238 (1988). Generally, an employment contract running for an indefinite term is presumed to be terminable at-will. *Maietta v. United Parcel Serv., Inc.,* 749 F.Supp. 1344, 1360 (D.N.J.1990), *aff'd without op.,* 932 F.2d 960 (3d Cir.1991). In some circumstances, however, language in an employment manual can create an implied promise to terminate only for just cause that may be enforceable against the employer, even when the relationship would otherwise be terminable at will. *Witkowski v. Thomas J. Lipton, Inc.,* 136 N.J. 385, 643 A.2d 546, 550 (1994) (citing *Woolley v. Hoffmann–La Roche,* 99 N.J. 284, 491 A.2d 1257, *modified,* 101 N.J. 10, 499 A.2d 515 (1985)); *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 643 A.2d 554, 557 (1994) (citation omitted). Thus, Ms. Brennan argues that Penn–Del's Employee Resolution Process ("ERP") operated to change her employment status from that of an at-will employee to one who would be discharged only

within one hundred eighty days after the alleged act of discrimination." 43 Pa.Stat.Ann. § 959(h)

(Supp.1994).

for cause. The ERP provides, in pertinent part, as follows:

> The [ERP] is established to assure that all employees are accorded fair and honest treatment in all aspects of his or her employment. The intent is to provide employees with a method by which they may obtain full review decisions concerning problems or complaints arising from the application of company policy or rules, in order to avoid any arbitrary actions.

The issue thus presented is whether the ERP conferred upon Ms. Brennan the right to be discharged only in accordance with the ERP's terms. The Supreme Court of New Jersey has recently set forth the considerations to be applied in resolving such questions, noting that "[t]he key consideration in determining whether an employment manual gives rise to contractual obligations is the reasonable expectations of the employees." *Witkowski,* 643 A.2d at 550. Since, under New Jersey law, the question of whether Ms. Brennan could reasonably have expected that the ERP created an implied modification to the employment contract is one for the jury to decide, *id.* at 553, our present task is to determine whether an issue of fact has been raised regarding the existence of the modification.

As New Jersey's highest court has held, the factors relevant to the issue relate to the specific provisions and the circumstances surrounding its publication and distribution. *Id.* at 550; *Nicosia,* 643 A.2d at 557. Thus, if an expression of policy receives wide distribution within the company, then it could give rise to an implied contract if it contains an express or implied promise regarding the terms and conditions of employment. *Witkowski,* 643 A.2d at 550 (citing *Gilbert v. Durand Glass Mfg. Co.,* 258 N.J.Super. 320, 609 A.2d 517 (App.Div.1992)); *Nicosia,* 643 A.2d at 558. Moreover, courts in New Jersey will examine the degree to which the provisions relating to job security and termination are specific and definitive, such that a jury could conclude the employer intended the provisions to be enforceable. *Witkowski,* 643 A.2d at 552.

Applying these principles to the matter at hand, it is clear that Ms. Brennan has created an issue of fact as to whether the ERP modified the employment contract to provide for termination for cause. First, while the parties have provided no information regarding the extent to which the ERP was distributed, we note that it was addressed to "All Employees," raising the inference that Penn–Del intended for it to be read and considered by all of the employees. We further note that Penn–Del intended for the ERP to supplement the company's employee manual. Finally, we note that the policy sets forth a three-step procedure under which an employee can discuss incidents which could lead to adverse employment actions, including termination. The stated goal of the ERP is "to avoid any arbitrary actions," which can be construed as an indicative of management's intent to terminate its employees only for cause. Thus, under these circumstances, we cannot say that there is no dispute as to whether the ERP operated to alter Ms. Brennan's employment status. Accordingly, we must deny Penn–Del's summary judgment motion as it applies to Counts VIII and X of the amended complaint.

## III. *SUMMARY AND CONCLUSION*

For the reasons stated above, the defendants' motion for summary judgment will be granted as to Defendants NTD and Bell Atlantic. As for Defendant Penn–Del, the motion for summary judgment will be granted as to Counts III, VI, and XI of the amended complaint. Further, summary judgment will be awarded to Penn–Del as follows: (1) to the extent Count II purports to state a claim for pregnancy disability discrimination, (2) to the extent Counts V and VII contain claims for relief under New Jersey law, and (3) to the extent Counts VIII and X contain claims for relief under Pennsylvania law. In all other respects, however, the defendants' motion for summary judgment will be denied.

An appropriate order follows.

### *ORDER*

AND NOW, this 7th day of April, 1995, upon consideration of Defendants' Motion for Summary Judgment, and the response there-

to, it is hereby ORDERED, for reasons set forth in the preceding memorandum, that:

1. Defendant Bell Atlantic Enterprises International's Motion for Summary Judgment is GRANTED;

2. Defendant National Telephone Directory Corporation's Motion for Summary Judgment is GRANTED; and

3. Defendant Penn–Del Directory Corporation's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART as follows:

a. The Motion for Summary Judgment is GRANTED as to Counts III, VI, and XI of the Amended Complaint;

b. The Motion for Summary Judgment is GRANTED to the extent Count II purports to state a claim for pregnancy disability discrimination;

c. The Motion for Summary Judgment is GRANTED to the extent Counts V and VII contain claims for relief under New Jersey law;

d. The Motion for Summary Judgment is GRANTED to the extent Counts VIII and X contain claims for relief under Pennsylvania law; and

e. The Motion for Summary Judgment is DENIED in all other respects.