**Opinion issued March 28, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00296-CV

————————————

**E-QUEST MANAGEMENT, LLC AND ODYSSEY ONESOURCE, INC.,**
**Appellants**

**V.**

**ROBBIE SHAW, Appellee**

On Appeal from the 212th District Court
Galveston County, Texas
Trial Court Case No. 08CV0414

## O P I N I O N

Appellants, E-Quest Management, LLC ("E-Quest") and Odyssey OneSource, Inc. ("Odyssey"), challenge the trial court's judgment, entered after a trial to the court, in favor of appellee, Robbie Shaw, in Shaw's suit against them

for successor liability. In five issues, E-Quest and Odyssey contend that they have been "prevented from proper presentment" of this appeal due to the trial court's not making their requested findings of fact and conclusions of law; the trial court entered judgment against Odyssey in violation of the statute of limitations; the trial court's judgment does not conform to Shaw's pleadings; Shaw lacked standing to pursue any successor-liability claim; Texas statutory law precludes Shaw's successor-liability claim; and the evidence is legally and factually insufficient to support the trial court's findings of fact.

We reverse and render.

## Background

In her third amended petition,[1] Shaw alleged that on December 4, 2001, Retirement Living Management, Inc. ("RLM") terminated her employment and, while at RLM, she was "treated differently because of her race, such that the terms and conditions of her employment were . . . affected." In October 2002, Shaw filed suit against RLM, and in May 2004, the district court entered a judgment against RLM, awarding Shaw $11,825 in damages, $54,365 in attorney's fees, reinstatement of her employment, and $200 per month from the date of the judgment until her reinstatement. Shortly thereafter, RLM filed for bankruptcy protection, and E-Quest and Odyssey "took over the assets of RLM and continued

---

[1] In her first amended petition, filed on April 23, 2008, Shaw brought claims only against E-Quest. Shaw did not bring suit against Odyssey until December 9, 2009.

2

the daily operations of RLM." In regard to her successor-liability claims, Shaw, in her petition, asserted,

> Defendants E-Quest and Odyssey should be held responsible should it be determined that RLM does not have the financial capabilities to pay a judgment. Defendants E-Quest and Odyssey have continued the operations and work force of the predecessor employers, and they also had notice of its predecessor's legal obligation when the assets of RLM were transferred to them. Since RLM is liable, but does not have the financial capability to pay a judgment, then Defendants E-Quest and Odyssey would have the ability and responsibility to provide adequate relief directly, including the required reinstatement of [Shaw].

At trial, Elmo Robinson testified that he was the president of RLM until he moved to Odyssey in May 2004. RLM managed retirement communities, hired employees, performed "all the human resources services," and provided administrative and record-keeping services. Robinson had been "involved" in Shaw's previous "discrimination lawsuit" against RLM, during which he was deposed.

On March 26, 2004, after the jury returned its verdict in the RLM lawsuit, but before the trial court signed its judgment, Robinson registered E-Quest as a limited liability corporation with the Texas Secretary of State. Robinson, E-Quest's registered agent, David Clement, and Sandra Paulson, jointly own E-Quest. Clement, who had been vice president of RLM, is E-Quest's vice president, and Paulson, who had been the secretary of RLM, is E-Quest's secretary. Although RLM's offices were located in a different suite, E-Quest's offices are

3

located in the same building.  And Robinson admitted that E-Quest assumed some of the properties that had been previously managed by RLM and E-Quest and RLM shared "some" of the same employees and officers, but not all of them.  On May 10, 2004, Odyssey and E-Quest signed an agreement to act as "co-employers" in their business.  Specifically, regarding Carriage Inn, the property at which Shaw previously worked, Odyssey and E-Quest "essentially took over the responsibility that [RLM] had before."  However, at no time did RLM, Odyssey, or E-Quest have an ownership interest in the property; they only performed "property management" functions.

On cross-examination, Robinson conceded that he had participated in RLM's bankruptcy proceedings, during which RLM's assets, estimated to be worth between $50,000 and $100,000, were turned over to the bankruptcy trustee.  And RLM had "over 200" creditors, including Shaw, when it filed for bankruptcy.  He explained that E-Quest and Odyssey did not "acquire anything" from RLM because all of its assets were turned over to the bankruptcy trustee.  Robinson further distinguished RLM from E-Quest by explaining,

> [RLM] was to hire and provide employees for the retirement communities performing all of the human resource functions that a company would perform.  E-Quest did none of that.  E-Quest simply was a company that could contract with [Odyssey] and at the same time provide some record keeping, administrative services to retirement communities.  It's a pass through organization with no employees including myself. . . .  E-Quest simply bills the retirement

4

communities, those funds are paid to E-Quest who in turn passes them through to [Odyssey].

Robinson had jointly owned RLM with Robert McKee, but McKee was not involved in either E-Quest or Odyssey. And no officer or shareholder of RLM was ever an officer or shareholder of Odyssey. Robinson, along with Clement and Gibson, fronted the initial capital to start E-Quest.

Mark Turner, an employee of Odyssey, explained that it was a "professional employer's organization" that never had any contact with RLM. First Odyssey Group entered a contract with E-Quest on May 10, 2004 to provide "HR out-sourcing, payroll, safety and loss control, . . . [and] worker's compensation"; it then assigned the contract to Odyssey on January 1, 2005. After entering the agreement, Odyssey enrolled any employee referred to it by E-Quest into its own payroll records and benefit programs, while E-Quest managed the "day to day operation of the employees" and had the most "direct control over the hiring and firing of employees."

After hearing the evidence, the trial court awarded Shaw "all damages" to which she was "entitled as described, outlined or otherwise stated" in the previous judgment she received against RLM: $11,825.80 in damages, reinstatement "together with all seniority and other company benefits," "$200 per month from May 14, 2004 until actual reinstatement," $54,365 in attorney's fees, and $3,240 in costs. In their initial briefing to this Court, E-Quest and Odyssey argued, among

other issues, that the trial court had erred in not entering findings of fact or conclusions of law despite their timely request. On agreement of the parties, we abated the appeal for the trial court to enter its findings of fact and conclusions of law, which it entered on September 22, 2011.

The trial court concluded that "E-Quest and Odyssey are the successors-in-interest to [RLM] under the doctrine of successor liability" and "[RLM's] bankruptcy does not deprive [Shaw] of the ability to assert her successor liability claim." The trial court found that:

1.      [Shaw] filed a lawsuit against [RLM], alleging race discrimination and retaliation.

2.      [Shaw] obtained a jury verdict against [RLM].

. . .

4.      Shortly after [Shaw] obtained a jury verdict . . ., E-Quest was created.

5.      Around the time that E-Quest was created, E-Quest and Odyssey began negotiations. Thereafter, E-Quest and Odyssey entered into a formal contractual relationship.

6.      Prior to filing for bankruptcy, [RLM] failed to abide by the terms of the judgment, and [Shaw] was never compensated . . . .

7.      [RLM] filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.

8.      [RLM's] bankruptcy case is closed.

9.      E-Quest and Odyssey had notices of [RLM's] legal obligations, specifically, [Shaw's] lawsuit, jury verdict, and/or judgment

against [RLM], to [Shaw] when the assets of [RLM] were transferred to E-Quest and Odyssey.

10. At the time of its organization, E-Quest and [RLM] had the same corporate officers and maintained the same corporate office.

11. E-Quest and/or Odyssey also hired the majority of [RLM's] prior employees.

12. Elmo Robinson, the former president of [RLM], is the current president of E-Quest.

13. Both Patricia Robinson, formerly known as Patricia Gibson, and David Clement, who were former officers of [RLM] are current officers of E-Quest.

14. E-Quest and Odyssey provide services for the properties served by [RLM]. . . .

15. The communities that E-Quest and Odyssey service require the same types or categories of employees as previously by [RLM].

16. After [RLM] filed for bankruptcy the services that were provided by [RLM] are not provided by Odyssey and E-Quest.

17. E-Quest and Odyssey are the successors-in-interest to [RLM] under the doctrine of successor liability.

18. [RLM] is [Shaw's] predecessor employer.

19. [RLM] does not have the financial capability to pay [Shaw's] judgment.

20. E-Quest and Odyssey have substantially continued the business operations of [RLM] as E-Quest and Odyssey either use the same plant, use the same or substantially the same workforce, use the same or substantially the same supervisory personnel, the same jobs exist under substantially the same working

conditions, use the same machinery, equipment and methods of production and/or produce the same product as [RLM].

21. Defendants E-Quest and Odyssey are liable to [Shaw] for the satisfaction of [Shaw's] judgment against predecessor [RLM] . . . .

After the trial court entered its findings of fact and conclusions of law, we reinstated this appeal. E-Quest and Odyssey then filed their supplemental brief, challenging the trial court's conclusions of law and the legal and factual sufficiency of the evidence supporting the trial court's findings of fact.

**Standard of Review**

We review a trial court's conclusions of law de novo, and we will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *In re Moers*, 104 S.W.3d 609, 611 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Although a trial court's conclusions of law may not be challenged for factual sufficiency, we may review the legal conclusions drawn from the facts to determine whether the conclusions are correct. *Marchand*, 83 S.W.3d at 794; *Holloway–Houston, Inc. v. Gulf Coast Bank & Trust Co.*, 224 S.W.3d 353, 357 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If we determine that a conclusion of law is erroneous, but the trial court nevertheless rendered the proper judgment, the error does not require reversal. *Marchand*, 83 S.W.3d at 794.

8

## Successor Liability

In their fourth issue, E-Quest and Odyssey argue that the trial court erred in concluding that Shaw can assert a successor-liability claim against them because, under Texas law, such a claim is "legally barred." *See* Act of May 4, 1979, 66th Leg., R.S., ch. 194, § 1, 1979 Tex. Gen. Laws 422, 422–23 (amended 1987, 1991, 1993, and 1997, recodified 2002) (current version at TEX. BUS. ORGS. CODE ANN. § 10.254 (Vernon Supp. 2012)).

In support of her successor-reliability claim, Shaw relies, in large part, on *Rojas v. TK Communications, Inc.*, 87 F.3d 745 (5th Cir. 1996). In *Rojas*, a female employee, who worked for a radio station owned by TK Communications, Inc. ("TK"), brought a sexual-harassment claim against TK under Title VII of the Civil Rights Act of 1964. *Id.* at 746. She later joined Tichenor Media Systems, Inc. ("Tichenor"), which had bought the radio station, under a theory of successor liability. *Id.* The United States Court of Appeals for the Fifth Circuit noted that, under "general contract principles," it was undisputed that Tichenor, in its asset-purchase agreement, "expressly excepted" the discrimination claim. *Id.* at 749. However, the court recognized that successor liability "does not arise from contract" but "labor law principles enunciated in four Supreme Court cases." *Id.* (citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S. Ct. 2225 (1987); *Howard Johnson Co. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 94 S.

Ct. 2236 (1974); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 92 S. Ct. 1571 (1972); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S. Ct. 909 (1964)). And the court explained that those labor law principles extended to "claims asserted under Title VII and related statutes" and supported the imposition of successor liability in such cases, explaining,

> [T]he successor doctrine arises in the context of discrimination cases in situations where the assets of a defendant employer are transferred to another entity. Thus, the purpose of the doctrine is to ensure that an employee's statutory rights are not "vitiated by the mere fact of a sudden change in the employer's business." The doctrine allows the aggrieved employee to enforce against the successor a claim he could have secured against the predecessor.
>
> Thus, applicability of the doctrine hinges on the need to protect a plaintiff where the offending entity is substituted by another company.

*Id.* at 750 (quoting *Brennan v. Nat'l Tel. Directory Corp.*, 881 F. Supp. 986, 992 (E.D. Pa. 1995) (citations omitted)). The court then identified "nine factors to be considered in determining whether successor liability should be imposed in a discrimination case":

> (1) whether the successor company had notice of the charge or pending lawsuit prior to acquiring the business or assets of the predecessor; (2) the ability of the predecessor to provide relief; (3) whether there has been substantial continuity of business operations; (4) whether the new employer uses the same plant; (5) whether he uses the same or substantially the same work force; (6) whether he uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether he uses the same machinery, equipment, and methods of production; and (9) whether he produces the same product.

10

*Id.* (quoting *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985)). Of these nine factors, the first two are critical, while the remaining seven simply "provide a foundation for analyzing the larger question of whether there is a continuity in operations and the work force of the successor and predecessor employers." *Id.* (quoting *Musikiwamba*, 760 F.2d at 751).

E-Quest and Odyssey assert that, despite the court's reasoning in *Rojas* in regard to successor liability in the context of Title VII, this case is controlled by article 5.10 of the Texas Business Corporations Act, which provided,

> B.   A disposition of any, all, or substantially all, of the property and assets of a corporation, whether or not it requires the special authorization of the shareholders of the corporation . . . :
>
> (1)   is not considered to be a merger or conversion pursuant to this Act or otherwise; and
>
> (2)   except as otherwise expressly provided by another statute, does not make the acquiring corporation, foreign corporation, or other entity responsible or liable for *any liability or obligation of the selling corporation that the acquiring corporation, foreign corporation, or other entity did not expressly assume.*

Act of May 4, 1979, 66th Leg., R.S., ch. 194, § 1, 1979 Tex. Gen. Laws 422, 422–23 (amended 1987, 1991, 1993, and 1997, recodified 2002) (emphasis added). Shaw notes that article 5.10 has been "repealed, and is no longer in effect." However, article 5.10 in fact did not expire until January 1, 2010, over a year after Shaw filed the instant suit. *See* Act of May 13, 2003, 78th Leg., C.S., ch. 182, § 2,

11

2003 Tex. Gen Laws 267, 595 (expired Jan. 1, 2010). And the relevant part of the statute has since been recodified in the Texas Business Organizations Code, which states similarly,

> (a) A disposition of all or part of the property of a domestic entity, regardless of whether the disposition requires the approval of the entity's owners or members, is not a merger or conversion for any purpose.

> (b) Except as otherwise expressly provided by statute, a person acquiring property described by this section may not be held responsible or liable for a liability or obligation of the transferring domestic entity *that is not expressly assumed by the person.*

TEX. BUS. ORGS. CODE ANN. § 10.254 (Vernon Supp. 2012) (emphasis added).

As reflected in the above statutes, Texas "strongly embraces" a "non-liability" rule for corporate successors. *See Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 139 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). Texas law authorizes a successor to acquire the assets of a corporation without incurring any of the grantor corporation's liabilities unless the successor expressly assumes those liabilities. *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 780–81 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *Lockheed Martin*, 16 S.W.3d at 139; *see also McKee v. Am. Transfer and Storage*, 946 F. Supp. 485, 487 (N.D. Tex. 1996) ("The Texas Business & Corporations Act eliminates the doctrine of implied successor liability."). Thus, in Texas, there is no successor in interest when an acquiring corporation does not expressly agree to assume the liabilities of the other

12

party to an agreement because "successor" has a specialized meaning "beyond simple acquisition." *Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 828 (Tex. App.—Texarkana 2004, no pet.).

Shaw cites to no Texas authority applying successor liability as discussed by federal courts in the context of Title VII or otherwise imposing liability on a successor company in spite of the Texas rule in support of non-liability. However, the reasoning supporting the federal application of successor liability is similar to the reasoning supporting the "mere continuation" exception to limited liability, an exception "even more liberal" than the de facto merger doctrine. *See, e.g., Mudgett v. Paxson Mach. Co.*, 709 S.W.2d 755, 758 & n.4 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) (listing elements of "mere continuation" doctrine as whether "the buyer purchased the 'good will' and name of the seller, operated the business in the same place, with the same employees and continued to produce the same product") (citing *Cyr v. B. Offen & Co.*, 501 F.2d 1145, 1153 (1st Cir. 1974)); *see also Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 390–91 (5th Cir. 2000) (applying "mere continuation" doctrine under Louisiana law and listing elements as: "(1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facility in the same physical location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and

(8) whether the successor holds itself out as a continuation of the previous enterprise").

However, Texas courts have interpreted article 5.10 as expressly abrogating the mere continuation doctrine as a means of imposing successor liability. *See Motor Components, LLC v. Devon Energy Corp.*, 338 S.W.3d 198, 205 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("The Texas legislature rejected long ago the 'continuation' doctrine of implied successor liability . . . .") (citing TEX. BUS. ORGS. CODE ANN. § 10.254); *Shapolsky v. Brewton*, 56 S.W.3d 120, 137–38 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (holding that just as liability cannot be transferred under "mere continuation" doctrine, company's contacts cannot be imputed to successor for purposes of establishing personal jurisdiction), *abrogated on other grounds by Michiana Easy Livin' Country v. Holten*, 168 S.W.3d 777 (Tex. 2005); *Mudgett*, 709 S.W.2d at 758 ("Certainly if the de facto merger doctrine is contrary to the public policy of our state, so must be the mere continuation doctrine.").

Here, it is undisputed that neither E-Quest nor Odyssey "expressly assumed" liability for Shaw's judgment against RLM. Shaw argues that we should nevertheless extend the successor-liability doctrine from *Rojas* to the present case because the above cited Texas cases "do not involve employment discrimination claims." She notes that in *Rojas* the Fifth Circuit stated that the doctrine of

14

successor liability "has been extended to claims asserted under Title VII and related statutes." *Rojas*, 87 F.3d at 750. As stated by the Texas Supreme Court, one of the purposes of the Texas Commission on Human Rights Act ("TCHRA") is to "provide for execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001) (citing TEX. LABOR CODE ANN. § 21.001(1)). "Therefore, analogous federal statutes and cases interpreting them guide our reading of the TCHRA." *Id.* (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999)).

However, as Shaw concedes in her brief, successor liability, as discussed by the federal courts, is a "common law" doctrine, like the "mere continuation" doctrine. It is not based on a statutory interpretation of Title VII, but rather "derived from equitable principles." *See, e.g., Brzozowski v. Correctional Physician Servs., Inc.*, 360 F.3d 173, 178 (3rd Cir. 2004); *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 265 (1st Cir. 1997) ("[S]uccessor liability is an equitable doctrine, both in origin and nature."). And, unlike in *Rojas*, where the plaintiff brought suit under Title VII and directly joined the defendants in that suit, Shaw brings her claim under neither Title VII or the TCHRA. Rather, Shaw seeks to recover on a judgment entered long ago, presumably for violations of the

15

TCHRA. And, again, Shaw cites us to no Texas authority imposing successor liability under such circumstances.

Shaw does note that a federal district court has applied successor liability to claims brought under the TCHRA. *See Mendez v. Ameri-Forge Corp.*, No. Civ.A. H-01-0523, 2005 WL 2241009, at \*4 (S.D. Tex. Sept. 15, 2005). Although the federal district court in *Mendez* did provide a brief analysis of the applicability of successor liability to the plaintiff's claims brought under both Title VII and the TCHRA, it ultimately resolved the case by concluding that the plaintiff had failed to timely prosecute the action. *Id.* at \*4–5; *but see McKee*, 946 F. Supp. at 487 (declining to apply successor liability to Texas wrongful-termination claim, brought along with claim under Americans with Disabilities Act, because of Texas statute limiting successor liability to those expressly assumed); *Schutze v. Fin. Computer Software*, No. 04-CV-0276-H, 2006 WL 2842008, at \*9–10 & n.2 (N.D. Tex. Sept. 29, 2006) (concluding it "clearly true" that successor liability could not apply to plaintiff's Texas discrimination claims and assuming, without deciding, that doctrine could not apply to plaintiff's statutory discrimination claims brought under TCHRA). As a result, *Mendez* is inapplicable here.

In light of the express statutory mandate precluding the imposition of implied successor liability under Texas law, we conclude that Shaw's successor-liability claim is precluded by Texas statute. *See* Act of May 4, 1979, 66th Leg.,

R.S., ch. 194, § 1, 1979 Tex. Gen. Laws 422, 422–23 (amended 1987, 1991, 1993, and 1997, recodified 2002); TEX. BUS. ORGS. CODE ANN. § 10.254; *see also Motor Components, LLC*, 338 S.W.3d at 205 ("The Texas legislature rejected long ago the 'continuation' doctrine of implied successor liability . . . ."); *Lockheed Martin*, 16 S.W.3d at 139.

Accordingly, we hold that the trial court erred in concluding otherwise.

## Conclusion

Having held that the trial court erred in concluding that Shaw's successor-liability claim is not barred by Texas law, we need not address the remaining issues of E-Quest and Odyssey. We reverse the judgment of the trial court and render a take-nothing judgment in favor of E-Quest and Odyssey.



Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.